File Name: 07a0266n.06

Filed: April 10, 2007

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No. 06-3905

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

IHAB ELGABI,

    Plaintiff-Appellant,

v.

TOLEDO AREA REGIONAL TRANSIT
AUTHORITY,

    Defendant-Appellee.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

_____/

Before:      MERRITT and MARTIN, Circuit Judges; FORESTER, District Judge.[*]

**OPINION**

    BOYCE F. MARTIN, JR., Circuit Judge. Ihab Elgabi brought suit against the Toledo Area Regional Transit Authority ("TARTA"), alleging violations of Title VII of the Civil Rights Act, as well as related state law claims, based on his discharge as a probationary TARTA employee. The district court granted summary judgment on behalf of TARTA, the decision from which Elgabi appeals, and that we now affirm.

I.

    The district court set forth the following facts in its summary judgment opinion:

---

[*]The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Ihab Elgabi ("Elgabi") is of Egyptian national origin. Elgabi applied for employment as a driver with [TARTA] and completed an application for employment in that regard on March 7, 2002. On the application, Elgabi listed a social security number ending in 9726. He responded to the questions on the application as follows:

> Other than for traffic violations, have you been convicted in a court of law? (Elgabi answered) "No."
> Have you had any moving violations? (Elgabi answered) "No."

At the end of the application, just above his signature, was the following statement:

> Do you fully understand that for the first 90 days of your employment, beginning with your In-Service Date, you will be on probation, which means that your continued employment will be at the discretion of TARTA? Yes: (to which Elgabi wrote yes and initialed).
>
> Do you authorize TARTA to make any investigation/background check it considers necessary in regard to your application? Yes: (to which Elgabi wrote yes and initialed).
>
> I certify that such information contained in this application and all supporting documents is correct to the best of my knowledge and understand that falsification of employment records is grounds for dismissal regardless of the date such falsification is discovered.

Under this last statement, Elgabi signed his name and dated his application.

On March 15, 2002, TARTA requested an independent criminal background and driving history be conducted by Data Research, Inc. TARTA provided Data Research with the information provided by Elgabi on his application. The report did not reveal any criminal or traffic offenses and covered the three years preceding the application.

In June 2002, Elgabi was hired into TARTA's June training class and the effective date of his employment was June 24, 2002. At that time he was promoted from a driver trainee to a part-time driver.

According to Elgabi, shortly after his employment at TARTA began, he also applied for a position with the Toledo Public Schools ("TPS"). In the application with TPS, Elgabi also used the same social security number as provided to TARTA and agreed to a criminal background check with the Federal Bureau of Investigation ("FBI").

The FBI check revealed a criminal conviction for domestic violence and an arrest for a firearms violation. Elgabi was informed by TPS that he was ineligible for employment due to his domestic violence conviction.

The director of TARTA's transportation, John Stewart, was advised by TPS about Elgabi's background check and the information was deemed "disturbing." (Gerald Bowsher Dep., p. 34.) Ultimately, TARTA acquired the information from TPS and confirmed it with the Oregon Police Department. Additionally, TARTA discovered conviction for a traffic offense. Gerald Bowsher ("Bowsher"), TARTA's Director of Human Resources also asked for a meeting with the FBI to review the data. Thereafter, Bowsher and the acting superintendent of TARTA, Gerald Austin ("Austin") made the decision to terminate Elgabi based upon falsification of his employment application. (Id., pp. 43-44.). Elgabi was terminated from his employment effective September 12, 2002.

The station supervisor, Timothy Butler, escorted Elgabi from the property and reported that Elgabi stated that he [Elgabi] "was a trained weapon and bomb specialist and what Mr. Bowsher did was wrong." (Bowsher Aff., P6.). Based upon this statement, Bowsher posted Elgabi's photograph with the following statement: "Attention: If you should see this man on TARTA property you are to notify a supervisor immediately. Name: Ihab Elgabi. Former Operator # 1706." (Bowsher Dep., p. 51.).

After Elgabi's termination, the local ABC affiliate, Channel 13's I-Team undertook an investigation regarding the criminal records of TARTA drivers. Channel 13 advised TARTA that based upon its research, eighteen drivers had prior criminal and traffic offenses. TARTA then undertook its own investigation and determined that four of the eighteen drivers had not completely disclosed their criminal histories and those four drivers were terminated. A subsequent investigation by TARTA and unrestricted as to time, resulted in additional terminations of five drivers for falsification of their application.

In March 2005, Elgabi filed suit against TARTA alleging national origin discrimination under Title VII, 42 U.S.C. § 2000e and the Ohio Civil Rights Act, Ohio Rev. Code § 4112.02, seeking damages, reinstatement and injunctive relief.

D. Ct. Op. at 1-4.

In granting summary judgment on behalf of TARTA, the district court reasoned that Elgabi

could not make out a prima facie case under the *McDonnell-Douglas/Burdine* burden shifting

framework because he could not show that he was treated differently than similarly situated employees. D. Ct. Op. at 7-10. It also determined that even had Elgabi made out a prima facie case, TARTA met its burden of showing a legitimate, non-discriminatory reason for his discharge — to wit, his lying about past criminal conduct and moving violations on his application — and that Elgabi could not that this reason was pretextual. D. Ct. Op. at 10-12. The district court noted that Elgabi's claims under the Ohio Civil Rights Act essentially subsumed by his Title VII claim, as the "Ohio Supreme Court has held that the [statute's] coverage . . . is identical to the coverage of federal law prohibiting discrimination in the employment context." D. Ct. Op. at 7 n. 1. Elgabi does not challenge this determination on appeal.

## II.

We review a district court's grant of summary judgment de novo, and must view "the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the non-moving party." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1996)). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56). Weighing of the evidence or making credibility determinations are prohibited at summary judgment — rather, all facts must be viewed in the light most favorable to the non-moving party. *Id.*

Elgabi sought to advance his case with indirect evidence of discrimination under the *McDonnell Douglas-Burdine* burden shifting approach. *See generally McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

Under *McDonnell Douglas*, a plaintiff who cannot present direct evidence can establish a prima facie case of discrimination where he can show (1) that he was a member of a protected class; (2) that he was qualified for the position in question; (3) that he was subjected to an adverse job action; and (4) that he was replaced by a person outside the protected class, or treated less favorably than a similarly situated person outside the protected class. *Johnson v. University of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Where a plaintiff can make such a showing, "a mandatory presumption of discrimination is created and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id*. If the defendant articulates a legitimate, non-discriminatory basis for the decision, "then the plaintiff must prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id*. "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (en banc) (6th Cir. 2003).

III.

Elgabi first challenges the district court's determination that he did not make out a prima facie case under *McDonnell Douglas*. The parties do not dispute the presence of the first three elements of a prima facie case: Elgabi is part of a protected class due to his Egyptian national origin, he was qualified for the bus driver position, and he suffered an adverse job action when he was

terminated. The dispute here turns on whether Elgabi was treated differently than similarly situated individuals who were not members of the protected class.

When TARTA conducted its investigation of its employees, prompted in part by the Channel 13 "I-Team" investigation, it eventually determined that 18 of its drivers had significant traffic violations. Of the eighteen, two had committed traffic infractions while TARTA employees, and had therefore not falsified their applications. According to TARTA's Director of Human Resources, Gerald Bowsher, the agency was not capable of discharging the remaining sixteen employees, who were less than forthcoming on their applications, because of the adverse affects such a layoff would have on both bus service and labor-management relations. As a result, TARTA decided to limit the terminations to those employees who had failed to disclose criminal convictions, allowing it to retain employees whose applications only omitted past traffic offenses. The terminated employees were Steven Traudt, Paul Waites, Emory Mitchell and Jose Cardenas. Bowsher also testified that since 1999, TARTA has terminated every employee that it has discovered to have lied about past criminal history, both before and since Elgabi's termination.

Elgabi identifies six of the sixteen TARTA employees who made misrepresentations on their applications as similarly situated individuals who did not receive adverse job actions. These six employees fall into two different groups. The first group includes the two other employees, Traudt and Waites, who lied about past criminal conduct on their applications. Traudt failed to disclose that he had been convicted for aggravated vehicular homicide, and Waite failed to disclose that he had been convicted of obstructing official business, and charged but not convicted of disorderly conduct, carrying a concealed weapon, and domestic violence. When TARTA discovered that Traudt and

Waite each had a conviction that they failed to disclosed on their application, it fired both men from their positions. Unlike Elgabi, however, both Traudt and Waites were members of the Amalgamated Transit Union, and after filing grievances with the Union, both were reinstated to their positions without backpay or benefits.[1]

The second group of employees identified by Elgabi includes those who failed to disclose moving violations in their applications: John Carswell, Steven Villagomez, Marvin Smith, and Shawn Turner. Their collective, unreported traffic violations included operation of a vehicle at a stop sign, failure to control, driving under suspension, and inability to stop an assured clear distance, among others. Villagomez also failed to report a criminal charge of failing to register a dog or kennel.

The district court was correct that Elgabi failed to establish the fourth prong of his prima facie case. Considering the second group first, Elgabi clearly is not similarly situated to the four employees who were retained despite failing to disclose traffic violations, because he did more than fail to disclose traffic violations. He failed to disclose a criminal conviction for violent conduct, which TARTA could quite reasonably determine to be more troubling than past moving violations. The very cases upon which Elgabi relies undermine his position. We have held that "to be deemed 'similarly-situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating

---

[1] Although it is not apparent from the parties' briefs, it would seem that Mitchell and Cardenas were not reinstated, which likely explains why Elgabi focuses his argument only on Traudt and Waite.

circumstances that would distinguish their conduct or the employer's treatment of them for it.'"

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).[2] Clearly there are

differentiating circumstances that distinguish Elgabi's conduct from those of the employees who

failed to disclose moving violations alone: he omitted criminal convictions from his application and

they did not. Therefore they were not similarly situated.

The district court also correctly determined that Elgabi did not establish the fourth element

of his prima facie case through comparisons to Traudt or Waites. These two employees were

similarly situated to Elgabi in that both failed to disclose past criminal convictions in their job

applications. Also like Elgabi, however, both were terminated by TARTA. Although Elgabi makes

much of the fact that both were later reinstated to their positions, this is simply a consequence of

their union membership and the grievance process, as well as their non-probationary status. Thus

---

[2]It may be worth noting that opinions of this Court have cautioned against conflating the fourth prong of the prima facie case — comparison to similarly situated individuals — with the subsequent inquiry regarding whether the employer's proffered justification for the adverse job action is pretextual. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) ("[W]e are mindful of the fact that prior Sixth Circuit case law warns against conflating the first (prima facie case) and second (articulation of a legitimate non-discriminatory reason) steps in the *McDonnell-Douglas* analysis."); *see also id.* at 247 (Moore, J., concurring) (arguing that the panel majority's analysis in fact conflated the two steps, and that the plaintiff had made out a prima facie case). This concern is based on the fact that the prima facie case is "not onerous" and is usually "easily met." *Cline v .Catholic Diocese*, 206 F.3d 651, 660 (6th Cir. 1999). It would seem that this concern is particularly relevant in cases where an employment decision is based on the relevant qualifications of different employees. *See, e.g., White*, 429 F.3d at 242. Thus, where qualifications are roughly similar, an employer's decision to select a given employee based on her qualifications might be a legitimate, non-discriminatory, non-pretextual basis from the challenged decision, but it would not automatically defeat the plaintiff's prima facie case. *See id.* at 247 (Moore, J., concurring). Where the challenged decision is disciplinary in nature, however, the concern of conflating the steps of the *McDonnell-Douglas* analysis are met so long as there are clear distinctions in the conduct of the employees in question.

for purposes of reinstatement, Elgabi was not similarly situated to Traudt and Waites. In focusing on their position post-termination, these three employees were clearly not similarly situated. As TARTA points out, we have found probationary status to be a relevant consideration for the similarly-situated inquiry. *See Cooper v. North Olmsted*, 795 F.2d 1265, 1270-71 (6th Cir. 1986) ("A probationary period of employment permits a company to weed out or eliminate undesirable employees. The opportunity to dismiss more readily those new employees whose job performance is unsatisfactory is particularly important to [a municipal bus line]. As a common carrier, [the municipal bus line] has the duty of exercising the highest standard of care for the safety of its passengers. Probationary bus drivers therefore do not stand on equal footing with permanent drivers, and cannot be considered to be similarly situated." (internal citations omitted)).

Because neither Traudt nor Waites were similarly situated to Elgabi, the district court was correct that this comparison does not help Elgabi establish the fourth element of his prima facie case, and in granting TARTA's summary judgment motion on this basis. We therefore affirm the disposition for this reason. Because Elgabi failed to make out a prima facie case of discrimination under Title VII, we find it unnecessary to assess whether TARTA's proffered explanation for his discharge was pretextual.