[Cite as *Johnson v. Dept. of Youth Servs.*, 2018-Ohio-1499.]

| | |
|---|---|
| AUDRA JOHNSON | Case No. 2017-00054JD |
| Plaintiff | Judge Patrick M. McGrath<br>Magistrate Robert Van Schoyck |
| v. | |
| OHIO DEPARTMENT OF YOUTH SERVICES | <u>DECISION</u> |
| Defendant | |

{¶1} On December 15, 2017, defendant filed a motion for summary judgment pursuant to Civ.R. 56(B). With leave of court, plaintiff filed a response on January 19, 2018. The motion is now before the court for a non-oral hearing pursuant to L.C.C.R. 4(D).

{¶2} Civ.R. 56(C) states, in part, as follows:

{¶3} "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." *See also Gilbert v. Summit Cty.*, 104 Ohio St.3d 660, 2004-Ohio-7108, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317 (1977).

{¶4} It is undisputed that plaintiff was employed by defendant as an Intervention Specialist, also known as a special education teacher, in the Ralph C. Starkey School at

the Circleville Juvenile Correctional Facility (CJCF) beginning on January 5, 2015. Based upon defendant's termination of her employment approximately six months later, plaintiff brings this action for unlawful employment discrimination on the basis of race, and also for retaliation, in violation of R.C. 4112.02 and 4112.99.

## COUNT ONE: RACE DISCRIMINATION

{¶5} "Under Ohio law, an employer may not discharge without just cause, refuse to hire or otherwise discriminate against an individual with respect to hire, tenure, terms, conditions or privileges of employment 'because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry' of that person." *Burns v. Ohio State Univ. College of Veterinary Med.*, 10th Dist. Franklin No. 13AP-633, 2014-Ohio-1190, ¶ 6, quoting R.C. 4112.02(A). The Supreme Court of Ohio has also "determined that federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e et seq., Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Little Forest Med. Ctr. v. Ohio Civil Rights Comm.*, 61 Ohio St.3d 607, 609-610 (1991).

{¶6} "'To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent' and may establish such intent through either direct or indirect methods of proof." *Dautartas v. Abbott Labs.*, 10th Dist. Franklin No. 11AP-706, 2012-Ohio-1709, ¶ 25, quoting *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist.1998). In this case, plaintiff seeks to establish discriminatory intent through the indirect method, which is subject to the burden shifting analysis established by the United States Supreme Court *in McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Nist v. Nexeo Solutions, LLC*, 10th Dist. Franklin No. 14AP-854, 2015-Ohio-3363, ¶ 31.

{¶7} "Under *McDonnell Douglas*, a plaintiff must first present evidence from which a reasonable jury could conclude that there exists a prima facie case of discrimination." *Turner v. Shahed Ents.*, 10th Dist. Franklin No. 10AP-892, 2011-Ohio-4654, ¶ 11-12. "In order to establish a prima facie case, a plaintiff must demonstrate

that he or she: (1) was a member of the statutorily protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) was replaced by a person outside the protected class or that the employer treated a similarly situated, non-protected person more favorably." *Nelson v. Univ. of Cincinnati*, 10th Dist. Franklin No. 16AP-224, 2017-Ohio-514, ¶ 33. "If the plaintiff meets her initial burden, the burden then shifts to the defendant to offer 'evidence of a legitimate, nondiscriminatory reason for' the adverse action. * * * If the defendant meets its burden, the burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason was actually a pretext for unlawful discrimination." *Turner* at ¶ 14.

{¶8} In its motion, defendant does not dispute that plaintiff, who is African American, is a member of a statutorily protected class, that she suffered an adverse employment action in the form of her employment being terminated, and that she was qualified for the position she held. Defendant argues, though, that plaintiff cannot satisfy the final element necessary for establishing her prima facie case, being that she was either replaced by a person outside the protected class or that a similarly situated, non-protected person was treated more favorably.

{¶9} Plaintiff's theory is that defendant treated a similarly situated, non-protected person more favorably. Plaintiff identifies Tamara Lane as one such person. There is no dispute that Lane is Caucasian. From the evidence presented, however, it cannot be concluded that Lane was similarly situated to plaintiff, who was considered a probationary employee inasmuch as she was in the first year of employment. Plaintiff admitted that she did not think Lane was a probationary employee. (Johnson Depo, p. 57.) Indeed, Patrick Buchanan, who was the Principal of the school at all times relevant, testified in a deposition that Lane had been employed at CJCF for several years. (Buchanan Depo., p. 41.) Yolonda Frierson, Deputy Superintendent of Programs for CJCF, explains in an affidavit that plaintiff's status as a probationary employee meant that she served at-will and could be terminated for any reason not prohibited by law. (Frierson Affidavit, ¶ 2.)

{¶10} Furthermore, the only comparison that plaintiff draws between herself and Lane pertains to tardiness. Plaintiff stated in her deposition that she knew Lane was often tardy because Lane was "always behind me" when clocking in. (Johnson Depo., p. 86.) But according to Frierson, plaintiff's termination was recommended by the superintendent of CJCF "based on attendance issues, unprofessional conduct and deficiencies in her performance. Specific performance issues included poor quality IEPs and incomplete progress notes." (Frierson Affidavit, ¶ 9.) Considering that the evidence of Lane's conduct is limited to tardiness and does not pertain to these other factors, and given that plaintiff was a probationary employee and Lane was not, it must be concluded that plaintiff and Lane were not similarly situated. *Mowery v. Columbus*, 10th Dist. Franklin No. 05AP-266, 2006-Ohio-1153, ¶ 46 ("Federal courts have frequently noted that probationary employees are not similarly situated to their non-probationary co-workers"); *Elgabi v. Toledo Area Regional Transit Auth.*, 228 Fed.Appx. 537, 542 (6th Cir.2007).

{¶11} Plaintiff also identifies Valerie Zielinski as a non-protected person whom she contends was similarly situated and treated more favorably. There is no dispute that Zielinski is Caucasian, and, according to plaintiff's deposition testimony, Zielinski was also a probationary employee, having begun employment at CJCF about two months before plaintiff. (Johnson Depo., p. 57.) Plaintiff also testified that she and Zielinski held the same position and were both supervised by Buchanan and Assistant Principal David Boso. (Id., pp. 57-58.)

{¶12} Defendant argues, however, that Zielinski was not similarly situated because she did not engage in the same conduct as plaintiff. "Where the plaintiff contends her employer treated a non-protected similarly situated person better, the individual with whom the plaintiff seeks to compare her treatment must be similar in all relevant respects." *Kenner v. Grant/Riverside Med. Care Found.*, 10th Dist. Franklin No. 15AP-982, 2017-Ohio-1349, ¶ 33, citing *Ames v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 14AP-119, 2014-Ohio-4774, ¶ 42. "Courts evaluate whether the

proffered individual dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. A person is not similarly situated unless the conduct engaged by the proffered individual is of 'comparable seriousness' to the conduct that predicted the employee/plaintiff's termination." (Citation omitted.) *Id.* at ¶ 33.

{¶13} As stated earlier, defendant has presented evidence that the termination of plaintiff's employment "was based on attendance issues, unprofessional conduct and deficiencies in her performance. Specific performance issues included poor quality IEPs and incomplete progress notes." (Frierson Affidavit, ¶ 9.) For her part, plaintiff testified that she only recalled getting a termination letter from defendant's director and that she was never informed of the reasons. (Johnson Depo., pp. 50, 68.)

{¶14} It is undisputed that special education teachers at CJCF were required to complete IEPs (i.e. Individual Education Plans) and progress notes as part of their job duties. Boso, the Assistant Principal, avers in his affidavit that on March 25 and 27, 2015, he sent emails to school officials documenting plaintiff's failure to complete or turn in progress notes for several students, and he recommended at that time that plaintiff's employment be terminated. (Boso Affidavit, ¶ 4.) Boso avers that on April 27, 2015, he sent Buchanan an email documenting that plaintiff failed to complete progress notes by the end of the most recent session on the academic calendar, but that Zielinski and other teachers did complete theirs. (Id.) Boso avers that on May 7, 2015, he sent plaintiff and Zielinski an email instructing them to complete their goals for two students, but that plaintiff later responded that she was unable to do so. (Id.) Boso avers that on May 19, 2015, he sent Buchanan an email documenting that despite being given multiple days off to complete her IEPs, plaintiff failed to do so and another teacher had to complete them for her. (Id.) Boso avers that on June 12, 2015, he sent an email to Buchanan noting that plaintiff failed to produce progress notes for a particular student.

(Id.) Boso avers that on June 23, 2015, he sent Buchanan an email noting that he met with plaintiff to discuss a particular student's IEP, but that it was incomplete. (Id.)

{¶15} In addition to Boso's dissatisfaction with plaintiff's IEPs and progress notes, Buchanan avers in an affidavit that he sent an email to Frierson and the superintendent on May 19, 2015, recommending that plaintiff's employment be terminated based in part upon her failure to timely complete IEPs and progress notes. (Buchanan Affidavit, ¶ 5.) And, Frierson states in her affidavit that three days later, on May 22, 2015, a meeting was held between herself, Buchanan, the superintendent, a union representative, and plaintiff "to discuss deficiencies in her performance regarding the poor quality of her [IEPs], incomplete progress notes, and timekeeping issues." (Frierson Affidavit, ¶ 5.) According to plaintiff, she had requested this meeting herself intending to meet only with Frierson so that she could discuss some concerns she had, but when the meeting was actually held it involved the other individuals and criticisms were raised against her instead, including for tardiness and failing to complete progress reports. (Johnson Depo., pp. 208-209.)

{¶16} It is undisputed that each teacher had a list of students for whom they were required to complete an IEP and progress notes. Plaintiff testified that within each IEP there were sections that would be completed in part by other teachers pertaining to the particular subjects that they taught, and, according to plaintiff, there was one IEP that Buchanan criticized that had been partially completed by Zielinski. (Johnson Depo., p. 81.) Whether or not Zielinski shared in the completion of this particular IEP, the evidence presented by defendant shows that there were several IEPs and progress notes that plaintiff was responsible for which CJCF officials found deficient. Plaintiff also has not pointed to evidence that would show that Zielinski required as much time or supervision as plaintiff to complete her own IEPs and progress notes. Although plaintiff asserts that "Zielinski was given an opportunity for overtime in which she could complete her IEPs" (Response, p. 5), it is not clear what evidence plaintiff is referring to with this statement. There is evidence, however, that plaintiff and Zielinski were both

given time on May 8, 2015 to complete IEPs, and that plaintiff took longer to get hers done and required more prodding from school officials. (Boso Affidavit, Exhibit E; Johnson Depo., Exhibit J.) Indeed, Boso states in his affidavit that Zielinski was under his supervision and that she "did not have the same difficulty as Ms. Johnson in completing her IEPs and progress notes." (Boso Affidavit, ¶ 5.) As one example, Buchanan noted in his May 19, 2015 email recommending termination that plaintiff "had failed to complete her progress notes prior to leaving for intersession" but that "[t]he rest of the Special Education staff did complete their progress notes prior to leaving for intersession." (Buchanan Affidavit, ¶ 5.) While plaintiff argues that she eventually completed all the IEPs she was responsible for, even if that were true, defendant has presented uncontroverted evidence that they were not timely completed, and that she did not timely complete her progress reports.

{¶17} Plaintiff, who acknowledged being experienced in completing IEPs and getting six weeks of general training from defendant when she was hired, also asserts that defendant did not provide her specialized training on how to complete IEPs until June 2015. (Johnson Depo., p. 115). But, there is no evidence that defendant ever gave Zielinski any specialized training on IEPs, let alone that it did so sooner than when plaintiff received such training. In sum, even though plaintiff cited some reasons that she felt prevented her from completing her IEPs and progress notes on time, and even though plaintiff contends that Zielinski was partly responsible for one particular IEP that Buchanan criticized, there is uncontroverted evidence before the court to demonstrate that plaintiff did fail on multiple occasions to timely and properly complete IEPs and progress notes, and there is a paucity of evidence of comparable conduct on the part of Zielinski.

{¶18} Regarding attendance issues, Buchanan states in his affidavit that his May 19, 2015 email recommending termination was also based in part upon tardiness and failure to follow proper timekeeping and call-off procedures. (Buchanan Affidavit, ¶ 5.) In the email, an authenticated copy of which is attached to Buchanan's affidavit, he

identified multiple infractions of the timekeeping rules as well as what he considered four instances of tardiness within a two-week span from late April to early May 2015. Plaintiff also acknowledged in her deposition that Buchanan criticized her on another occasion for being tardy three times in one week. (Johnson Depo., p. 85.) Even though plaintiff contends that she was "technically" not tardy on some of the dates specified in Buchanan's email because she was entitled to a "6 minute grace period," she has not disputed that she failed to clock in by her 7:00 a.m. report time on several occasions, nor has she presented evidence to controvert all the evidence of timekeeping and call-off infractions. More importantly, plaintiff is not aware of any occasions when Zielinski was tardy (Johnson Depo., p. 85) and she has not offered evidence that Zielinski failed to follow proper timekeeping and call-off procedures.

{¶19} Regarding unprofessional conduct serving as a basis for the termination, Boso described in his affidavit an incident that took place on March 3, 2015, which he documented in a statement attached to the affidavit. (Boso Affidavit, ¶ 4.) As Boso related, plaintiff felt that a student had threatened her and she refused to report to her classroom that day even after he told her that she must do so, and, as a result, Boso had to get another teacher to substitute for plaintiff. In her deposition, plaintiff explained that she did not feel comfortable being in the classroom then, but Boso ordered her to go in. (Johnson Depo., pp. 82-83.) Plaintiff admitted that she was told she was being insubordinate and disobeying a direct order. (Id., p. 82.) When asked about an account of this incident that Buchanan included in his May 19, 2015 email recommending termination, wherein Buchanan wrote that plaintiff subsequently left CJCF for the day and called off the next two days, plaintiff explained that she became ill. (Id., p. 176.) Buchanan also wrote in the email that when plaintiff returned to work, a meeting was held with school management who informed her that she could not refuse a direct order and that she needed to be on time to class.

{¶20} Regarding another alleged incident of unprofessional conduct, John Terry, the Operations Manager for the school at CJCF, states in an affidavit that on June 17,

2015, he observed plaintiff engage in "inappropriate behavior" that led him to send Frierson the following message in an email later that same day:

> a. I just wanted you to know that I just had the most interesting (for a lack of better words) encounter with Ms. Johnson in the school. She was upset with youth [redacted] and wanted him out of the classroom. I responded with several youth Specialists to accommodate. Prior to entering the classroom and then again when we were using verbal strategy she was screaming at the top of her lungs, "Get him out, I want you to take him out of here now, he threatened to spit on me, get him out". She repeated this over and over. Then she left the classroom and was in the hallway screaming. As we were talking to the youth a minute or two to calm him, she came back into the class and ordered us to get him out. She started screaming at the youth again and I had to ask her to leave as she continued to shout at him. I stepped into the hallway with her and she started screaming how I had all of those big guys in the classroom and she couldn't teach. I told her that we have procedures and a policy that we were following to ensure we handle these matters correctly. She was totally out of control and I had to talk to her for a few minutes to bring her down so we could deal with the youth. At one point I had to tell her that she was totally out of control. I have not experienced a situation quite like this with a teacher ever. She has exhibited similar behavior before, but today she was really inappropriate. Ms. Frierson, I wish everyone the best at trying to do their jobs in this environment and I try to be objective. But, from one professional to another, I don't believe this teacher is fit for longevity here. Review the tape from this incident occurring between 10:15 and 10:30 in classroom #12 and in the east hallway and you can see that I did stay poised and tried to calm the teacher down.

{¶21} Although plaintiff denied screaming and having to be calmed down, she did acknowledge that there was an incident with a youth whom she told Terry to remove from her classroom, she acknowledged that she may have raised her voice and also put a hand on Terry, and she was unable to recall whether she argued with the student. (Johnson Depo., pp. 196-199, 213.) Frierson, who avers in her affidavit that she reviewed video footage of the incident, stated that the incident was a serious matter, that plaintiff's behavior was "unacceptable and it represented a security risk to the

School. She set a bad example for her students." (Frierson Affidavit, ¶ 7.) Frierson states that she summoned plaintiff to meet with her later that day, but plaintiff would not do so without a union representative. (Id., ¶ 6.) Frierson states that she rescheduled for a time when the union representative could be present, but that plaintiff refused to attend the rescheduled meeting. (Id.) For her part, plaintiff stated that she did decline to talk to Frierson without a union representative and she does not recall ever meeting with Frierson again. (Johnson Depo., p. 215.) Following this incident, which took place on Friday, June 19, 2015, plaintiff went on medical leave effective Tuesday, June 23, 2015, and remained on leave through the date of her termination, according to a letter that she testified that she sent to defendant's director after her termination. (Johnson Depo, p. 47.)

{¶22} Plaintiff's version of the March 3 and June 17, 2015 incidents differs in part from the versions recounted by defendant's employees. Nevertheless, plaintiff acknowledged that in one instance she would not go into her classroom and her supervisor considered her insubordinate as a result, and that in the other instance she had an encounter with a youth with whom she may have argued, she may have raised her voice, and she put a hand on Terry and told him to remove the youth from her classroom. Defendant has presented evidence demonstrating that CJCF officials were troubled by what they viewed as insubordinate and unprofessional conduct on the part of plaintiff in these incidents. Even though plaintiff disputes the egregiousness of her conduct, her burden is to show that Zielinski engaged in conduct of comparable seriousness. To that end, plaintiff has identified no evidence whatsoever that Zielinski ever engaged in conduct that is in any way comparable even to plaintiff's own version of the March 3 and June 17, 2015 incidents, and plaintiff admitted that she has no knowledge whether Zielinski was ever accused of disobeying a direct order or being insubordinate. (Id., p. 83.)

{¶23} Considering the evidence presented about the alleged insubordinate and unprofessional conduct, the failure to timely complete IEPs and progress reports, and

the tardiness and timekeeping issues, reasonable minds can only conclude that plaintiff cannot show that she and Zielinski engaged in conduct of comparable seriousness. Therefore, Zielinski cannot be considered to have been similarly situated to plaintiff in all respects. Because plaintiff cannot show that a similarly situated, non-protected person was treated more favorably, she cannot establish a prima facie case of discrimination.

{¶24} Additionally, even if plaintiff had been able to establish a prima facie case, defendant has articulated legitimate, non-discriminatory reasons as to why plaintiff's employment was terminated. Plaintiff was a probationary employee whose employment could be terminated for any lawful reason, and the evidence described above demonstrates that the termination was based upon "attendance issues, unprofessional conduct and deficiencies in her performance. Specific performance issues included poor quality IEPs and incomplete progress notes." (Frierson Affidavit, ¶ 9.)

{¶25} In order to show that an employer's proffered reason is pretextual, "a plaintiff must submit evidence that an employer's proffered reason (1) had no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. Franklin No. 11AP-1068, 2012-Ohio-5036, ¶ 27. "Regardless of which option is chosen, the plaintiff must produce sufficient evidence from which the trier of fact could reasonably reject the employer's explanation and infer that the employer intentionally discriminated against him." *Knepper v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1155, 2011-Ohio-6054, ¶ 12. "A plaintiff cannot establish that a proffered reason is pretext for discrimination unless the plaintiff shows '*both* that the reason was false, *and* that discrimination was the real reason.'" (Emphasis sic.) *Boyd v. Ohio Dept. of Mental Health*, 10th Dist. Franklin No. 10AP-906, 2011-Ohio-3596, ¶ 28, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

{¶26} While plaintiff argues that defendant's proffered reasons for the termination are based on incorrect or incomplete information, there can be no dispute that those reasons have some basis in fact inasmuch as uncontroverted evidence shows that she

did have some tardiness and timekeeping issues, she did fail to timely complete IEPs and progress reports, and she was involved in incidents that prison officials viewed as examples of unprofessional and insubordinate behavior. Furthermore, a simple denial of the conduct that defendant proffered as its reasoning is insufficient to avoid summary judgment, and instead plaintiff "must present evidence creating a material dispute as to the employer's honest belief in its proffered legitimate, nondiscriminatory reason." *Wigglesworth v. Mettler Toledo Internatl., Inc.*, 10th Dist. Franklin No. 09AP-411, 2010-Ohio-1019, ¶ 19.

{¶27} Plaintiff argues that discriminatory intent on the part of defendant is evident in that she was "treated differently than her white co-workers" and was set "up to fail from day one because of her race." (Response, p. 9.) Specifically, plaintiff argues that Buchanan failed to introduce her to her co-workers when she started working there, like he did for other new employees. While Buchanan disputed this in his deposition (Buchanan Depo., p. 28), in any event the characterization of this as an example of racial animus is based upon conjecture, particularly considering that it could just as easily be attributed to Buchanan forgetting to introduce her. Plaintiff also argues that Buchanan only criticized her, not Zielinski, for one particular IEP that Buchanan found to be deficient even though Zielinski had completed half of it, but plaintiff testified that Buchanan did not know about Zielinski's involvement. (Johnson Depo., p. 81.) Plaintiff also points to the fact that defendant provided her with training on how to complete IEPs not long before her termination, rather than earlier in her tenure, but plaintiff identifies no evidence whatsoever to suggest that other teachers normally received such training, much less that they did so sooner than when plaintiff received it. Plaintiff also argues that Buchanan would not let her move her desk closer to the door as a safety measure, but even if this were true, the dispositive issue is whether defendant was motivated by discriminatory animus. *Morrissette v. DFS Servs., LLC*, 10th Dist. Franklin No. 12AP-611, 2013-Ohio-4336, ¶ 38. Plaintiff testified that she felt Buchanan was racist, but she admitted that she never heard him make any racist remark (Johnson Depo., p. 141),

and based upon the evidence that plaintiff cites it cannot be concluded that attributing a discriminatory motive to Buchanan is based upon anything more than conjecture, which is insufficient. *Ressler v. Attorney Gen.*, 10th Dist. Franklin No. 14AP-519, 2015-Ohio-777, ¶ 19. And, it is significant that the termination was preceded by criticism from several officials, not Buchanan alone, and there is evidence that multiple officials including Boso and Terry, and ultimately the superintendent and director, concluded at different times that plaintiff should no longer be employed at CJCF. In short, plaintiff has failed to meet the ultimate burden of presenting evidence that discrimination on the basis of race "was the real reason for the employer's action." *Pla v. Cleveland State Univ.*, 10th Dist. Franklin No. 16AP-366, 2016-Ohio-8165, ¶ 22.

**{¶28}** Construing the evidence most strongly in favor of plaintiff, no reasonable finder of fact can conclude that the reasons proffered by defendant for the termination of plaintiff's employment were merely pretext.

**{¶29}** Based upon the foregoing, defendant is entitled to judgment on Count One of the complaint.

**COUNT TWO: RETALIATION**

**{¶30}** R.C. 4112.02 provides, in part:

**{¶31}** "It shall be an unlawful discriminatory practice:

**{¶32}** "* * *

**{¶33}** "(I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

**{¶34}** "Absent direct evidence of retaliatory intent, Ohio courts analyze retaliation claims using the evidentiary framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed. 2d 668 * * *." *Veal v. Upreach LLC*, 10th Dist. Franklin No. 11AP-192, 2011-Ohio-5406,

¶ 16. "Under that framework, a plaintiff bears the initial burden of establishing a prima facie case of retaliation. Specifically, the plaintiff must establish that (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Id.*

{¶35} Plaintiff claims that she engaged in a protected activity by speaking with an investigator about a "sexual harassment" claim against Buchanan, and that defendant retaliated against her by subsequently terminating her employment. In her deposition, plaintiff testified that one day in June 2015 she was asked to answer some questions from David Haynes, whom plaintiff understood to be an investigator looking into an allegation that Buchanan had said a job opening at CJCF was likely to be filled by a particular teacher who already worked there because that teacher was "homosexual." (Johnson Depo, pp. 230-232.) Plaintiff stated that when Haynes interviewed her, she told him that she heard secondhand from Zielinski that Buchanan made such a remark. (Id., p. 229.)

{¶36} In an affidavit submitted by defendant, David Haynes avers that on May 28, 2015, he served as defendant's senior investigator and was given an assignment to investigate an allegation made by Zielinski "that she heard Patrick Buchanan refer to another teacher as homosexual." (Haynes Affidavit, ¶ 1.) Haynes avers that on June 15, 2015, he interviewed plaintiff in the course of his investigation and that plaintiff told him the following: "I reported to Ms. Frierson that there was a job opening and that Ms. Zielinski and myself were interested in the job. Mr. Buchanan said to Ms. Zielinski that the new teacher would get the job because she was a homosexual. Ms. Zielinski or myself might be interested in this job and that it would not be fair without first considering us." (Haynes Affidavit, ¶ 2.) According to Haynes, when he asked how plaintiff learned this information, she said she heard it from Zielinski. (Id.) Buchanan, in his deposition, testified that the basis of the investigation was that Zielinski made an

allegation against him, which he disputes, to the effect that he made a "homophobic" statement.  (Buchanan Depo., p. 46.)

{¶37} In its motion, defendant argues that plaintiff did not engage in a protected activity for purposes of a retaliation claim under R.C. 4112.02(I) and thus cannot meet the first element of her prima facie case.  In response, plaintiff argues that she "participated in a protected activity by testifying against Buchanan in a sexual harassment investigation."  (Response, p. 8.)

{¶38} While R.C. 4112.02(A) prohibits harassment in the employment context based upon a person's "sex," that term as it appears in the statute does not encompass sexual orientation.  *Burns v. Ohio State Univ. College of Veterinary Med.*, 10th Dist. Franklin No. 13AP-633, 2014-Ohio-1190, ¶ 10; *see also Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir.2006) (under Title VII, "sexual orientation is not a prohibited basis for discriminatory acts").

{¶39} As previously stated, R.C. 4112.02(I) prohibits an employer from discriminating against any other person because that person "has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." Here, plaintiff participated in an interview in an investigation into whether Buchanan said another teacher was likely to be offered a job because of that teacher's sexual orientation.  Plaintiff identifies no authority for concluding that such conduct is unlawful under R.C. Chapter 4112.  Indeed, the only reasonable conclusion that can be drawn is that the alleged conduct which plaintiff spoke about to Haynes was not an unlawful discriminatory practice under R.C. Chapter 4112 and cannot form the basis of a retaliation claim under R.C. 4112.02(I).  *See Grimsley v. Am. Showa, Inc.*, S.D.Ohio No. 3:17-cv-24, 2017 U.S. Dist. LEXIS 133350 (Aug. 21, 2017), citing *Gilbert v. Country Music Assn., Inc.*, 432 Fed.Appx. 516, 520 (6th Cir.2011) (former employee allegedly terminated in retaliation for complaining of harassment and discrimination based on

sexual orientation failed to state a claim under R.C. 4112.02(I) and Title VII because the conduct he opposed was not an unlawful employment practice); *Currie v. Cleveland Metro. School Dist.*, N.D.Ohio No. 1:15 CV 262, 2015 U.S. Dist. LEXIS 87311 (July 6, 2015) ("claims of harassment on the basis of sexual orientation cannot give rise to a Title VII retaliation claim").

{¶40} Moreover, plaintiff has failed to adduce evidence of a causal connection between her participation in the interview with Haynes and her termination.  As set forth above in the analysis of plaintiff's discrimination claim, defendant has articulated legitimate, non-discriminatory reasons for terminating plaintiff's employment.  In arguing that her termination was causally related to the interview, plaintiff emphasizes that only eight days after the interview, Buchanan sent an email recommending that she be terminated, and it was not long after that when defendant's director made the decision to do so.  But Frierson's affidavit testimony demonstrates that the director made the decision upon the recommendation of the CJCF superintendent.  And, while the timing of an employee's termination can contribute to an inference of retaliation, temporal proximity alone is not sufficient to demonstrate a causal connection, and this is especially true where there are intervening performance concerns. *Sells v. Holiday Mgt. Ltd.*, 10th Dist. Franklin No. 11AP-205, 2011-Ohio-5974, ¶ 35.  Subsequent to her interview with Haynes, plaintiff was involved in the June 17, 2015 incident that led Terry to independently opine that plaintiff was unfit for employment at CJCF, representing at least the third different employee to have offered such an opinion in writing up to that point.  Defendant has presented evidence demonstrating that CJCF officials found plaintiff's conduct in that incident to be unprofessional and incompatible with the safe and orderly operation of the facility.  Furthermore, plaintiff testified that on another occasion after Haynes interviewed her, another one of her IEPs was found to be deficient and Buchanan and Boso required her to correct it.  (Johnson Depo., p. 74.) Plaintiff has not presented evidence from which it could be inferred that her termination was causally connected to her interview with Haynes, as opposed to her conduct in the

subsequent June 17, 2015 incident and the subsequent IEP that was incorrectly prepared, on top of the prior issues discussed earlier.

{¶41} Construing the evidence most strongly in favor of plaintiff, no reasonable finder of fact can conclude that plaintiff has established a prima facie case of retaliation. And, as with the claim of race discrimination, even if she had been able to do so, it cannot be concluded that the legitimate, non-discriminatory reasons proffered by defendant for the termination of plaintiff's employment were merely pretext. Accordingly, defendant is entitled to judgment on Count Two of the complaint.


**CONCLUSION**

{¶42} Based upon the foregoing, the court concludes that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law. Accordingly, defendant's motion for summary judgment shall be granted and judgment shall be rendered in favor of defendant.


PATRICK M. MCGRATH
Judge

[Cite as *Johnson v. Dept. of Youth Servs.*, 2018-Ohio-1499.]

AUDRA JOHNSON

    Plaintiff

    v.

OHIO DEPARTMENT OF YOUTH
SERVICES

    Defendant

Case No. 2017-00054JD

Judge Patrick M. McGrath
Magistrate Robert Van Schoyck

<u>JUDGMENT ENTRY</u>

    **{¶43}** A non-oral hearing was conducted in this case upon defendant's motion for summary judgment. For the reasons set forth in the decision filed concurrently herewith, the court concludes that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law. As a result, defendant's motion for summary judgment is GRANTED and judgment is hereby rendered in favor of defendant. All previously scheduled events are VACATED. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

 

PATRICK M. MCGRATH
Judge

cc:

Eric A Walker
Howard H Harcha IV
150 East Gay Street 18th Floor
Columbus OH  43215-3130

Erica Ann Probst
88 West Mound Street
Columbus OH  43215-5084

**Filed February 13, 2018**
**Sent to S.C. Reporter 4/19/18**